**UNITED STATES**

v.

**Airman First Class Daniel L.
BERKHIMER, United
States Air Force**

ACM 37850

U.S. Air Force Court of Criminal Appeals

Sentence adjudged 9 December 2010 by
GCM convened at Joint Base McGuire–
Dix–Lakehurst, New Jersey.

10 June 2013

Military Judge: John P. Taitt.

Appellate Counsel for the appellant: Major Scott W. Medlyn and Captain Travis K. Ausland.

Appellate Counsel for the United States: Colonel Don M. Christensen; Major Daniel J. Breen; Major Scott C. Jansen; and Gerald R. Bruce, Esquire.

Before ROAN, MARKSTEINER, and HECKER, Appellate Military Judges.

OPINION OF THE COURT

HECKER, Judge:

At a general court-martial, the appellant was convicted, consistent with his pleas, of wrongfully using marijuana, cocaine, and Ecstasy, as well as wrongfully distributing oxycodone, oxymorphone, and morphine, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a, as well as possession of a handgun without first obtaining a permit as required by New Jersey law, in violation of Article 134, UCMJ, 10 U.S.C. § 934. Officer members adjudged a sentence of a bad-conduct discharge, confinement for 6 months, restriction to base for 2 months, and reduction to the grade of E–1. The convening authority approved all aspects of the sentence except the restriction.

On appeal, the appellant asserts that the three distribution specifications must be set aside because the Government violated his "military due process rights" by repeatedly engaging in outrageous conduct during an undercover operation. We disagree with the appellant on that issue but set aside his conviction for possessing a handgun based on an improvident guilty plea.

*Background*

In April 2010, the appellant's friend, Airman (Amn) CI, was interviewed by agents from the Air Force Office of Special Investigations (AFOSI) as part of a drug investigation. During that interview, Amn CI eventually admitted having knowledge of drug use by military members and told the agents about the appellant's drug use. He then agreed to become a confidential source for AFOSI and provide them information about the appellant.

On several occasions in April 2010, the appellant provided prescription medication and Ecstasy to Amn CI in exchange for money. During these exchanges, Amn CI was working with AFOSI. After the appellant was arrested by AFOSI, he admitted under rights advisement that he had distributed pills to Amn CI and used marijuana, cocaine, and Ecstasy on multiple occasions in 2009 and 2010 while in Johnstown with civil-

ian friends. Following his arrest on 11 May 2010, a search of the appellant's off-base residence revealed a loaded 25 caliber pistol hidden in his closet.

At his court-martial, the appellant pled guilty to using cocaine, marijuana, and Ecstasy on divers occasions during 2009 and 2010 and to possession of a non-permitted handgun. He also pled guilty, conditionally, to distributing oxycodone, oxymorphone, and morphine.[1] At trial, he moved to dismiss these specifications based on the "outrageous conduct" of Amn CI and the AFOSI agents who worked with him, contending it violated his "military due process" rights. The military judge denied that motion and the appellant now raises the issue on appeal.

### Outrageous Government Conduct and Due Process

The appellant's motion at trial and complaint on appeal is that the conduct of the AFOSI agents was outrageous in that they took advantage of two young Airmen, playing one off of the other to create a crime simply for the sake of prosecution, essentially entrapping the appellant. He contends this Government misconduct violated his right to due process.[2]

 "Entrapment" is an affirmative and complete defense to criminal liability for acts one is induced to commit by law enforcement officials (and those working with them) when one is not predisposed to engage in that activity. Rule for Court–Martial 916(g); *Jacobson v. United States,* 503 U.S. 540, 548, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). This defense exists to prevent government officials from becoming overly aggressive and "implant[ing]" in an innocent person's mind the disposition to commit a criminal act, and then induc[ing the] commission of the crime so that the Government may prosecute." *Id.* at 548, 112 S.Ct. 1535. Two different approaches for determining whether entrapment has occurred have evolved through case law—the subjective and the objective tests. *United States v. Clark,* 28 M.J. 401, 407 (C.M.A.1989).

 The "subjective test" focuses on the accused's state of mind. Under this test, an accused must demonstrate that, but for the police conduct, he or she would not have committed a crime, thus balancing the predisposition of a defendant to commit an offense against the actions of the police in encouraging the commission of the offense. *United States v. Vanzandt,* 14 M.J. 332, 340 (C.M.A.1982). An accused cannot be considered "entrapped" if he is "predisposed" to commit the crime regardless of the governmental involvement in his activities. *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Hampton v. United States,* 425 U.S. 484, 488, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell,* 411 U.S. 423, 426, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (clarifying that "[i]t is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play"). In determining entrapment, "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman,* 356 U.S. at 372–73, 78 S.Ct. 819; *United States v. Bell,* 38 M.J. 358, 360 (C.M.A.1993).

 As the Supreme Court was developing the line of cases that led to the "subjective test" becoming the majority view, it left open the possibility of "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, ... violating [ ] fundamental fairness, shocking [ ] the universal sense of justice mandated by

---

1. Pursuant to Rule for Courts–Martial 910(a)(2), the appellant entered a conditional guilty plea to these three specifications, reserving the right to raise this issue on appeal.

2. The appellant argues that certain military appellate cases have created the concept of "military due process," which he contends provides rights beyond those afforded him under constitutional due process. Our superior court has re-

cently made clear this is not the case. In *United States v. Vazquez,* 72 M.J. 13 (C.A.A.F.2013), the Court held that service members do not "enjoy due process protections above and beyond the panoply of rights provided to them by the plain text of the Constitution, the UCMJ, and the [*Manual for Courts–Martial*]." *Id.* at 19. Accordingly, we must evaluate the appellant's claims here under those established standards.

the Due Process Clause of the Fifth Amendment."[3] *Russell,* 411 U.S. at 431–32, 93 S.Ct. 1637 (internal quotation marks and citations omitted); *Hampton,* 425 U.S. at 492, 96 S.Ct. 1646 (Powell, J., concurring) (stating the due process guarantee may prevent the conviction of a predisposed defendant in light of outrageous police behavior in some circumstances). This is referred to as the "objective test," and serves as the basis for the appellant's claim on appeal.

Our superior court, while noting the Supreme Court has found the subjective test to be "paramount," has also recognized that the objective test can be applicable in a "unique, peculiar situation where the conduct of the government agents reaches the point of shocking the judicial conscience." *Vanzandt,* 14 M.J. at 342, 343 n. 11; *see United States v. Lemaster,* 40 M.J. 178, 181 (C.M.A.1994) (declining to decide whether law enforcement activity was "outrageous" in the Constitutional sense but finding "[a]t a minimum, it violates the fundamental norms of 'military due process' and is the functional equivalent of entrapment" (citation omitted)); *United States v. Cooper,* 33 M.J. 356, 358 (C.M.A. 1991); *Bell,* 38 M.J. at 364 n.6; *United States v. Harms,* 14 M.J. 677, 678 (A.F.C.M.R.1982). Other federal courts have also recognized this concept. *E.g., United States v. Doe,* 698 F.3d 1284, 1293 (10th Cir.2012); *United States v. Smith,* 924 F.2d 889, 897 (9th Cir.1991); *United States v. Hunt,* 171 F.3d 1192, 1194–96 (8th Cir.1999); *United States v. Augustin,* 661 F.3d 1105, 1122–23 (11th Cir.2011). *But see Hampton,* 425 U.S. at 488–90, 96 S.Ct. 1646 (plurality opinion) (clarifying that the *Russell* decision ruled out the possibility that the defense of entrapment could ever be based on governmental misconduct where the predisposition of the defendant was established; the remedy for such misconduct is to prosecute the police, not release a guilty defendant).

▮▮ Here, the appellant contends that the Government's conduct was sufficiently outrageous and shocking to justify dismissal of his distribution specifications. The issue of whether an accused's due process rights were violated is a question of law that this Court reviews de novo. *United States v. Lewis,* 69 M.J. 379, 383 (C.A.A.F.2011). When doing so, we give substantial deference to the military judge's findings of fact and will not overturn them unless they are clearly erroneous. *See United States v. King,* 61 M.J. 225, 227 (C.A.A.F.2005).

▮▮ To succeed on such an argument, the appellant must show "either: (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." *United States v. Pedraza,* 27 F.3d 1515, 1521 (10th Cir. 1994) (citation omitted). No single factor is dispositive and the analysis is based on the totality of the circumstances. *Owen v. Wainwright,* 806 F.2d 1519, 1521 (11th Cir. 1986); *United States v. Perrine,* 518 F.3d 1196, 1207 (10th Cir.2008). This is an "extraordinary defense reserved for only the most egregious circumstances" and is not to be invoked every time the government acts in a deceptive manner or participates in a crime it is investigating. *United States v. Mosley,* 965 F.2d 906, 909–10 (10th Cir.1992). To meet the threshold standard of being fundamentally unfair or shocking, the accused must generally show the government acted with coercion, violence or brutality to the person. *United States v. Patterson,* 25 M.J. 650, 651 (A.F.C.M.R.1987).

▮▮ The appellant's claim of outrageous government conduct stems from his belief that: (1) the situation here created, rather than infiltrated, a criminal enterprise; (2) AFOSI acted irresponsibly and improperly in using Amn CI as a confidential source, due to his credibility and anger management issues, and offering to pay certain money owed to Amn CI; (3) Amn CI repeatedly violated AFOSI's entrapment protocol and threatened the appellant without AFOSI remedying the situation; and (4) the appellant's outstanding debt owed to Amn CI was used coercively against him. After evaluating the evidence, we cannot say that this conduct was so "shocking to the universal sense of justice" as to warrant dismissal of these specifications.

3. U.S. Const. amend. V.

During an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session at trial, the appellant called Amn CI to testify about his interactions with the AFOSI agents and the appellant. The military judge also considered a stipulation of expected testimony from the AFOSI agent who worked with Amn CI in this operation and videotapes of AFOSI interviews with the appellant and Amn CI. Following that session, the military judge made findings of fact (summarized below), which we find are supported by the record and are not clearly erroneous.

On 12 April 2010, two AFOSI agents interviewed Amn CI concerning his involvement with and knowledge of controlled substances at Joint Military Base McGuire. During the initial stage of the interview, Amn CI denied using drugs or Spice, and he denied any knowledge of drug use by other Airmen. Eventually, Amn CI changed his position and began providing information about distribution or use by other Airmen, including the 19–year–old appellant. He admitted the appellant had previously provided him with 8–9 Adderall pills for a trip Amn CI was taking in the Fall of 2009, and the appellant had discussed his past drug use, including cocaine, marijuana, and various pills, when he was in his hometown. Based on those conversations, Amn CI thought the appellant could obtain drugs for him.

The next day, the agents provided Amn CI with initial confidential informant training, including training about entrapment. After Amn CI told the agents the appellant owed him approximately $1,500 for the recent purchase of a car and motorcycle, one of the agents told him to avoid bringing up the debt in connection with the undercover operation. The agents also told Amn CI to ask the appellant if he still had a "hookup" for pills, using a cover story that he had hurt his leg and wanted to self-treat the injury and avoid affecting an upcoming deployment.

Amn CI sent a text to this effect and the appellant agreed. The two exchanged several text messages, which included the appellant asking for assistance in getting his car released from impoundment. After AFOSI made those arrangements, Amn CI asked again about the pills, indicating the appellant owed him "big time" for that assistance. The appellant responded by asking if he wanted "roxies" or "roxycodone." Eventually, Amn CI said he had $200 and wanted 10 pills and a pill of Ecstasy. After the appellant indicated he was unable to purchase the pills until his next paycheck, Amn CI told the appellant to find a way to obtain the pills or he would repossess the car and motorcycle and return the $4,500 the appellant had paid towards them.

When Amn CI showed these text messages to one of the AFOSI agents, that agent provided Amn CI with refresher training on entrapment and told him not to bring up the car issue. He also told Amn CI not to press the appellant to bring pills back from leave. Consistent with this instruction, Amn CI did not have further communication with the appellant for almost a week, until the appellant texted him to say he had obtained six oxycodone pills and they would cost $42. The next day, Amn CI bought the pills from the appellant using $42 he received from AFOSI.

A few days later, an AFOSI agent learned the appellant was again going to Pennsylvania so he asked Amn CI to try to purchase $200 worth of pain pills and Ecstasy. AFOSI provided money to Amn CI, which he then passed to the appellant as up-front money. After the appellant obtained six morphine pills and one pill containing oxymorphone, Amn CI participated in a buy/bust operation with AFOSI. After the exchange of pills between the appellant and Amn CI, agents apprehended the appellant and seized the pills.

During an interview under rights advisement, the appellant admitted to distributing pills to Amn CI on these two occasions, having obtained these pills while on leave in Pennsylvania. He also admitted providing Amn CI with Adderall pills in the fall of 2009; distributing morphine to him in February 2010; using marijuana, cocaine, and Ecstasy while in his hometown; and that he had access to drugs there. Several times during this interview, the appellant said he obtained drugs for Amn CI as a favor but also because of the outstanding debt he owed on the car and motorcycle. He did not want to lose these vehicles because he had invested a

great deal of work in them. (The military judge noted there was no evidence presented that Amn CI took action to repossess these vehicles.) Having watched the videotaped interview, the military judge found the appellant appeared to be lucid, articulate, and thoughtful.

Here, we have carefully reviewed the evidence of record and the military judge's extensive and detailed findings of fact and conclusions of law addressing this issue. Considering the facts in light of the legal standards described above, we find this is not a "unique, peculiar situation where the conduct of the government agents reaches the point of shocking the judicial conscience." *Vanzandt*, 14 M.J. at 342. In our opinion, under the totality of the circumstances, the appellant has not shown excessive government involvement or significant coercion in these drug distributions.

The appellant had already distributed prescription drugs to Amn CI well before he began working with the AFOSI, and had openly told Amn CI about his illegal drug use and his access to those drugs. Thus, the appellant was already involved in drug use and distribution. Although Amn CI did contact the appellant to ask about the status of their drug transactions, it is not outrageous for the government to "induce a defendant to repeat, continue, or even expand previous criminal activity." *Pedraza*, 27 F.3d at 1521; *Mosley*, 965 F.2d at 911; *United States v. Belzer*, 743 F.2d 1213, 1218 (7th Cir.1984). We are also not convinced that Amn CI's references to the debt the appellant owed him constituted "significant coercion" that improperly induced the crime of drug distribution.

In sum, the undercover operation instituted by AFOSI with the assistance of Amn CI was not so outrageous that it violated fundamental fairness or was shocking to the universal sense of justice. Instead, it was a permissible exercise of law enforcement authority and, as such, it did not violate the appellant's due process rights under the Fifth Amendment.

## *Providency of Plea to Possession of a Handgun*

This Court reviews a military judge's decision to accept a plea of guilty for abuse of discretion. *United States v. Inabinette*, 66 M.J. 320, 321 (C.A.A.F.2008). It is an abuse of discretion for a military judge to accept a guilty plea without an adequate factual basis to support it. *Id.* at 321–22. It is also an abuse of discretion if the ruling is based on an erroneous view of the law. *Id.* at 322. We review questions of law arising from the guilty plea de novo. *Id.* at 322; *see also United States v. Goodman*, 70 M.J. 396, 400 (C.A.A.F.2011). We apply the "substantial basis" test, which looks at "whether there is something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea." *Inabinette*, 66 M.J. at 322.

After AFOSI arrested the appellant on 11 May 2010, agents searched his residence and found a loaded .25 caliber pistol hidden in his closet. In his guilty plea inquiry, the appellant admitted that he lived "off base . . . in base housing" and kept the weapon inside a sock inside a snowboarding boot in his closet. He owned the semi-automatic weapon, having procured it from a friend in his hometown earlier in 2010. He stated he had not registered the weapon with New Jersey nor did he have a New Jersey permit for it. For this, he was charged with a Specification under Article 134, UCMJ, that stated he:

> [D]id, at or near Joint Base McGuire–Dix–Lakehurst, New Jersey, on or about 11 May 2010, knowingly possess a handgun, without first having obtained a permit to carry the same, in violation of N.J.S.A 2C:39–5, which conduct was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces.

We find the appellant's plea to this specification to be improvident, as the guilty plea inquiry was based on an erroneous view of the law and also because an insufficient factual basis exists to sustain the conviction.

The language of the specification claims the appellant "*possess[ed]* a handgun, with-

out first having obtained a permit *to carry* the same, in violation of N.J.S.A 2C:39–5." (Emphasis added.). The New Jersey statute referenced in this specification ("Unlawful possession of weapons") makes it a third degree offense for a person to "knowingly ha[ve] in his possession any handgun … without having first obtained a permit to carry the same as provided in N.J.S. 2C:58–4" if that handgun can eject a bullet with sufficient force to injure a person. N.J.S. 2C:39–5b. The permit requirement is found in N.J.S. 2C:58–4 ("Permits to carry handguns") and contains the procedures that must be followed before a person in New Jersey can *carry* a handgun in the state.[4] Therefore, when the Specification and New Jersey statutes are considered in conjunction with each other, it is clear the appellant was charged with *possessing* a handgun without first obtaining a New Jersey permit to *carry* it, and that this fact pattern allegedly constituted the wrongful possession of a weapon under New Jersey law.

We note several problems. First, there is no requirement under New Jersey law that a person receive a "carry permit" before keeping a weapon in his home. In fact, New Jersey law expressly states that "[n]othing in [the unlawful possession offense] shall be construed to prevent a person from keeping or carrying about his … residence … any firearm…." N.J.S. 2C:39–6(e); *see also Piszczatoski v. Filko,* 840 F.Supp.2d 813, 816, 834 (D.N.J.2012) (stating that New Jersey law "draw[s] careful lines between permission to possess a gun in one's home … and permission to carry a gun," and "[n]o permit is needed to lawfully carry a handgun 'about [one's] … residence'" (second bracket in original)); *State v. Navarro,* 310 N.J.Super. 104, 108 n. 1, 708 A.2d 416 (App.Div.1998) ("[A] person may keep a handgun within his residence without obtaining a permit to carry a handgun.").

Second, when fashioning the elements for this offense, the military judge modified the specification as originally written. Specifically, the military judge advised the appel-

lant that two of the elements for this offense were that "he knowingly *possessed* a handgun" and "he did not obtain a permit *to possess or carry* a gun as required under New Jersey [law]." The specification itself stated that the offense was *"possessing "* the weapon without having a state-issued permit *"to carry "* it, so the second element should not have been modified to include the "possess" language. As noted above, the New Jersey statute referenced in the specification does not require an individual to obtain a permit before being in *possession* of a handgun, yet the elements used by the military judge created such a requirement and the appellant in his guilty plea inquiry agreed he unlawfully *possessed* a weapon without the "proper permit." This was also error.

Third, in instructing the appellant on the terminal element, the military judge defined that element as "under the circumstances, [the appellant's] *conduct in possessing this gun without a permit* was of a nature to bring discredit upon the armed forces or was prejudicial to good order and discipline in the armed forces" (emphasis added). The resulting statements by the appellant focused largely on the harm and/or problems that he believed stemmed from his failure to follow state law regarding his weapon. As discussed above, the appellant's conduct in possessing a handgun in his residence without a "carry permit" did not violate New Jersey law so the appellant's statements in that regard cannot be used to support his guilty plea. When those statements are excised from the guilty plea inquiry, the only remaining assertions by the appellant were that he had not told Security Forces that he possessed a handgun, the base "may" have a policy requiring him to do that, and that failing to register his weapon with the base would also be prejudicial to good order and discipline. Given that no evidence was presented at trial to indicate the appellant's residence was within the confines of the base or that the base did in fact have such a policy, we conclude there is an insufficient

---

**4.** To qualify for a carry permit under the New Jersey law, an applicant must demonstrate that he or she (1) is a person of good character who is not otherwise disqualified as a result of any stat-

utory disabilities, (2) is thoroughly familiar with the safe handling and use of handguns, and (3) "has a justifiable need to carry a handgun." N.J.S. 2C: 58–4(d).

factual basis to support the appellant's guilty plea. We therefore hold the appellant's guilty plea was improvident and set aside the conviction on this specification.

### Sentence Reassessment

 Having set aside the appellant's conviction of an offense, we must consider whether we can reassess the sentence or whether we must return the case for a rehearing on sentence. To validly reassess a sentence to purge the effect of error, we must be able to (1) discern the extent of the error's effect on the sentence and (2) conclude with confidence that, absent the error, the panel would have imposed a sentence of at least of a certain magnitude. *United States v. Buber,* 62 M.J. 476, 479 (C.A.A.F. 2006) (citing *United States v. Hawes,* 51 M.J. 258, 260 (C.A.A.F.1999); *United States v. Doss,* 57 M.J. 182, 185 (C.A.A.F.2002); *United States v. Taylor,* 51 M.J. 390, 391 (C.A.A.F.1999)). We must also determine that the sentence we propose to affirm is "appropriate," as required by Article 66(c), UCMJ, 10 U.S.C. § 866(c). "In short, a reassessed sentence must be purged of prejudicial error and also must be 'appropriate' for the offense involved." *United States v. Sales,* 22 M.J. 305, 307–08 (C.M.A.1986).

In this case, our action reduces the maximum permissible sentence that the appellant faced from 45 years to 42 years of confinement.[5] All other aspects of the maximum permissible sentence remain the same. In his sentencing argument, the trial counsel did mention the "illegal gun" on multiple occasions, including noting that the appellant distributed illegal drugs in his residence while he had a loaded handgun hidden there.

If the appellant had not been improperly convicted of the handgun offense, evidence that a weapon lawfully stored in his closet would not have been admissible in the case, and thus the trial counsel would not have been able to make these arguments.

Nonetheless, on the basis of the error noted, considering the evidence of record, and applying the principles set forth above, we determine that we can discern the effect of the errors and will reassess the sentence. Under the circumstances of this case, we are confident that the panel would have imposed a sentence including at least a bad-conduct discharge, confinement for five months, and reduction to the grade of E–1. We also find, after considering the appellant's character, the nature and seriousness of the offenses, and the entire record, that the reassessed sentence is appropriate.

### Conclusion

The finding of guilty to Charge II and its Specification are set aside and dismissed. The remaining findings and the sentence, as reassessed, are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred.[6] Articles 59(a) and 66(c), UCMJ, 10 U.S.C. 859(a), 866(c). Accordingly, the findings as modified, and the sentence as reassessed, are

AFFIRMED.

---

5. Under New Jersey law, unlawful possession of a weapon without a permit carried a maximum sentence of between three years and five years. N.J.S. 2C:43–6.

6. Though not raised as an issue on appeal, we note that the overall delay of more than 540 days between the time of docketing and review by this Court is facially unreasonable. *United States v. Moreno,* 63 M.J. 129, 142 (C.A.A.F.2006). Hav-

ing considered the totality of the circumstances and the entire record, we find that the appellate delay in this case was harmless beyond a reasonable doubt. *Id.* at 135–36 (reviewing claims of post-trial and appellate delay using the four-factor analysis found in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). *See also United States v. Harvey,* 64 M.J. 13, 24 (C.A.A.F.2006); *United States v. Tardif,* 57 M.J. 219, 225 (C.A.A.F.2002).